# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2014-DR-01689-SCT

*CALEB CORROTHERS a/k/a CALEB*
*CARROTHERS a/k/a CALBE CAROTHER a/k/a*
*CALEB L. CARROTHERS a/k/a CALEB*
*COROTHERS a/k/a CALAB CAROTHERS*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 05/20/2011 |
| TRIAL JUDGE: | HON. ANDREW K. HOWORTH |
| COURT FROM WHICH APPEALED: | LAFAYETTE COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | OFFICE OF CAPITAL POST-CONVICTION COUNSEL |
| | BY: LOUWLYNN VANZETTA WILLIAMS DELLWYN K. SMITH |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: BRAD ALAN SMITH |
| NATURE OF THE CASE: | CIVIL - DEATH PENALTY - POST CONVICTION |
| DISPOSITION: | LEAVE TO SEEK POST-CONVICTION RELIEF GRANTED IN PART AND DENIED IN PART - 02/02/2017 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**MAXWELL, JUSTICE, FOR THE COURT:**

¶1.     Caleb Corrothers was convicted of two counts of capital murder and one count of

aggravated assault.  For the two capital-murder convictions, he received the death penalty.

Corrothers appealed, and this Court affirmed his conviction and death sentence.[1] Corrothers now petitions this Court for permission to proceed in the trial court with a motion for post-conviction relief (PCR)—citing ten violations of his constitutional rights.

¶2. To be granted leave, Corrothers must present claims that are both procedurally alive and substantially show the denial of a state or federal right.[2] For nine of Corrothers's ten claims, we find Corrothers failed to meet this standard. But for Corrothers's claim of juror bias through improper contact, we find further proceedings in the trial court are necessary.[3] Thus, we grant him leave to proceed in the trial court on this issue only. We deny the rest of his petition.

### Background Facts and Procedural History

### I. Deadly Attack on Clark Family

¶3. Taylor Clark was known to sell marijuana occasionally. On the night of July 11, 2009, Taylor went to the home of his dealer's girlfriend, Karen Hickinbottom, to return the dealer's cell phone. While Taylor was there, a man showed up and asked to talk to Taylor. Taylor went outside with him. When Taylor came back inside, he said the man had wanted to buy drugs. The man came to Hickinbottom's door and asked to speak to Taylor again. Taylor and the man then left in Taylor's car.

---

[1] *Corrothers v. State*, 148 So. 3d 278 (Miss. 2014) (*Corrothers I*).

[2] Miss. Code Ann. § 99-39-27(5) (Rev. 2015).

[3] Miss. Code Ann. § 99-38-27(7)(b).

¶4.   At approximately 11:00 p.m., Taylor drove to his family's home, jumped out of the car, and ran into the house. Taylor's brother Joshua Clark saw an armed man emerge from the passenger side of Taylor's car and chase Taylor toward the house. Taylor was screaming to wake his parents, Frank and Tonya Clark. Frank ran to Taylor's aid. And they both held the door shut to keep the man out of the house. The man, however, shot through the door, striking and killing Frank. The man then entered the house and shot Tonya twice, but she survived. Taylor attempted to subdue the man. The man shot Taylor too, killing him.

¶5.   The man threatened both Joshua and Tonya and demanded money and car keys. Tonya gave the man $50 and the keys to Taylor's car. The man left in Taylor's car, turning down a dead-end road. Tonya called 911. When police arrived, they found Taylor's car abandoned. Police searched the area but did not find the suspect.

## II.   Investigation and Arrest

¶6.   Early the next morning, a walker came into contact with a shirtless man who appeared to be lost. The man claimed he had been attacked and asked for directions to the highway. Soon after, the shirtless man entered a gas station. The attendant noticed the man was covered in scratches. The man told the attendant he had been attacked by six people and needed to use the phone. The man made two phone calls but could not reach anyone. He then purchased several items and left.

¶7.   The gas-station security camera captured the exchange. Using the security-camera footage, police identified the shirtless man as Caleb Corrothers. Police compiled a six-person photo lineup, which they showed Tonya and Joshua five days after the crime,

3

during Taylor and Frank's visitation. Tonya could not identify the attacker. But Joshua identified Corrothers as the person who killed Taylor and Frank. A warrant was issued for Corrothers's arrest, and he turned himself in to the police.

¶8. Corrothers denied any involvement in the murders. But he did admit that he had bought marijuana from Taylor in May at a house near Tammy's Salon. The salon is located near Hickinbottom's house. Corrothers said that, on the night of July 11, he was attacked by a man named Suave and grazed by a bullet on his left thigh. Corrothers claimed a friend picked him up after the fight and took him home, where he went to sleep. Police were unable to verify Corrothers's story.

### III. Capital-Murder Trial

¶9. Corrothers was indicted on two counts of capital murder and one count of aggravated assault. He was charged as a habitual offender. At trial, Joshua, Tonya, Hickinbottom, the early-morning walker, and Investigator Scott Mills testified. Joshua and Tonya identified Corrothers as the shooter. Hickinbottom identified Corrothers in court as the man who came to her house to see Taylor that night. The State also called Tiffany Hutchins, the girlfriend of Corrothers's friend Frederick Holmes. According to Hutchins, Corrothers said he had killed some people while he "was trying to get him a lick." Holmes also testified, recounting the story Corrothers had told him about the night. The story Corrothers told Holmes matched the testimony given by Hickinbottom, Tonya, and Joshua. After two hours of deliberation, the jury found Corrothers guilty on all three counts.

¶10. The sentencing portion of trial commenced the following day. Several mitigation witnesses testified on behalf of Corrothers—Corrothers's mother Vonda, his brother, aunt, middle-school teacher, and a family friend—who all testified to his poor upbringing, his being raised by his mother, and his lack of a father figure. The jury also heard from Dr. Joseph Angelillo, an expert clinical psychologist. The jury rejected Corrothers's mitigation argument and sentenced him to death. This Court affirmed his convictions and death sentence on direct appeal. *Corrothers v. State*, 148 So. 3d 278 (Miss. 2014) (*Corrothers I*).

## IV. PCR Petition

¶11. Corrothers now petitions this Court for leave to proceed in the trial court with a PCR motion. *See* Miss. Code Ann. § 99-39-7 (Rev. 2015); M.R.A.P. 22. He presents ten issues—

I. In violation of the Sixth and Fourteenth Amendments, trial counsel was ineffective for failing to perform an adequate pretrial investigation and present available mitigation evidence from petitioner's available family members and friends at sentencing, such that petitioner was denied a fair trial and sentencing free from any arbitrary factors as required by the Eighth Amendment.

II. Petitioner was denied due process and a fair trial when the State presented identification testimony from a witness who could only provide an in-court identification of Mr. Corrothers.

III. Mr. Corrothers is entitled to an evidentiary [hearing] based on recanted identification testimony.

IV. In violation of the Eighth and Fourteenth Amendments, petitioner's death sentence is unconstitutional because an execution will create a substantial risk of cruel and unusual punishment.

V. In violation of the Sixth and Fourteenth Amendments, trial counsel was ineffective for failing to perform an adequate pretrial investigation and present that petitioner has been institutionalized most of his adolescent life and adulthood, such that petitioner was denied a fair trial, and

5

sentencing free from any arbitrary factors as required by the Eighth Amendment.

VI.  Counsel failed to reasonably ensure that jurors gave full effect to mitigating evidence.

VII.  In violation of the Sixth and Fourteenth Amendments, trial counsel was ineffective for failing to object to the prosecution's improper arguments during the capital sentencing closing arguments, such that petitioner was denied due process, a fair trial, and sentencing free from any arbitrary factors as required by the Eighth Amendment.

VIII.  Petitioner's constitutional right to an impartial jury was violated when a juror had improper communication with the victims' family member and witness, Tonya Clark.

IX.  In violation of the Sixth and Fourteenth Amendments of the United States Constitution, trial counsel's cumulative errors deprived petitioner of his constitutional right to effective assistance of counsel, a fundamentally fair trial, and due process of law.

X.  Petitioner's sentence is disproportionate and in violation of the Eighth and Fourteenth Amendments to the United States Constitution and the corresponding portions of the Mississippi Constitution.

We address these issues categorically, based on the constitutional right Corrothers alleges was violated.

¶12.  "Unless it appears from the face of the application, motion, exhibits and the prior record that the claims presented by those documents are not procedurally barred under Section 99-39-21 and that they further present a substantial showing of the denial of a state or federal right," we "shall . . . deny the application." Miss. Code Ann. § 99-39-27(5) (Rev. 2015).

## Discussion

### I.  Right to Counsel (Issues I, V, VI, VII, and IX)

6

¶13. Half of Corrothers's claims are directed toward his trial counsel, who Corrothers argues provided him constitutionally ineffective assistance, thus denying his Sixth Amendment right to counsel. U.S. Const. amend VI.

¶14. "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington*, 466 U.S. 668, 686, 104 S. Ct. 2052, 2064, 80 L. Ed. 2d 674 (1984). A defendant must demonstrate that his attorney's actions were deficient *and* that the deficiency prejudiced the defense of the case. *Id*. at 687. "Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable." *Stringer v. State*, 454 So. 2d 468, 477 (Miss. 1984) (citing *Strickland*, 466 U.S. at 687). The focus of the inquiry must be whether counsel's assistance was reasonable considering all the circumstances. *Id.*

¶15. With that standard in mind, we find Corrothers has failed to make both showings for any of his six ineffective-assistance-of-counsel claims.

### A. *Failure to Investigate Mitigating Circumstances*

¶16. Corrothers first asserts his trial counsel failed to effectively convey his home environment and family history during the sentencing phase of trial. He argues his counsel offered only a subset of his mitigating circumstances. And he claims defense counsel failed to investigate potential mitigation evidence, call additional witnesses, and prepare the witnesses who were called.

### 1.    Family, Friends, and Teachers

¶17.    To support his claim, Corrothers attaches affidavits from fourteen additional potential mitigation witnesses, as well as an affidavit from his mother Vonda, who had testified on his behalf during sentencing. But "[c]laims that additional witnesses should have been called are disfavored." *Turner v. State*, 953 So. 2d 1063, 1074 (Miss. 2007). There "is no prejudice when the new mitigating evidence would barely have altered the sentencing profile presented to the decision maker." *Chamberlin v. State*, 55 So. 3d 1046, 1054 (Miss. 2010) (internal quotations omitted) (quoting *Sears v. Upton*, 561 U.S. 945, 954, 130 S. Ct. 3259, 3266, 177 L. Ed. 2d 1025 (2010)). So to prevail on his claim, Corrothers must prove, "had the affiants been called to testify, there was a reasonable probability that the result of the proceeding would have been different." *Moffett v. State*, 156 So. 3d 835, 849 (Miss. 2004) (citing *Spicer v. State*, 973 So. 2d 184, 191 (Miss. 2007)). And here, Corrothers fails in his burden.

¶18.    Corrothers's poor home environment and family history were presented in detail at the sentencing phase. The jury heard from his mother,[4] brother,[5] church friend,[6] aunt,[7] and

---

[4] Vonda testified she and her children lived with her mother and several other family members, a total of ten, for a period of time. At one point, she left the children with her mother to attend college. She explained Corrothers's father, Lee Green, was never in the picture and had substance-abuse issues. She discussed her bouts with depression surrounding her mother's death and a failed marriage with her Nigerian husband, Godwin Agulanna. Vonda elaborated regarding how her depression affected her ability to raise her children. Because of her lack of resources, Vonda and her children lived in a low-income neighborhood near drug dealers. According to Vonda, Corrothers did not have a consistent male figure in his life, which caused him to "act up" when he was eight to nine years old.

[5] Marcus, Corrothers's brother, testified next. Green was Marcus's father as well, and Marcus reiterated Green's lack of involvement in their lives. Marcus left home at the age

8

middle-school teacher,[8] "who all testified to his poor upbringing, his being raised by his mother, and his lack of a father figure." ***Corrothers I***, 148 So. 3d at 292. The new affiants fall into these same categories, being either Corrothers's family members, church members, or school teachers. Many of the them present cumulative testimony. And none of their affidavit testimony covers any new subset of mitigating circumstances that was not

---

of fourteen to chase his dreams, making money. Because he had cars, clothes, and money, Marcus stated his younger brother probably wanted to follow in his footsteps. Marcus agreed it was not the best thing for Corrothers to look up to him and his street life. While Marcus and Corrothers were not close growing up, they formed a relationship in prison when they were assigned to the same facility. Marcus expressed, in hindsight, he should have been a better example to Corrothers. He then asked the jury to spare his brother's life and sentence him to life in prison.

[6] Jessie Thompson, a fellow church member of Vonda's, met Corrothers when he was seven or eight years old. At one point, Vonda's family lived with Thompson. She recounted how Corrothers would steal items as a child. Thompson stated Vonda did not know how to discipline Corrothers and his brothers, and Thompson attempted to intervene. According to Thompson, Corrothers resented the church because he felt it was taking his mother away from him.

[7] Kathy Sanders, Corrothers's aunt, stated she was a figurehead in Corrothers's life until she became hooked on drugs. She agreed Corrothers grew up in a bad neighborhood plagued with drug addicts. She also reiterated how Green was not involved in Corrothers's life. Sanders discussed Vonda's poor marriage to Godwin and her relationship with her church. Kathy also thought Corrothers resented his mother for her devotion to the church over her children.

[8] Arlene Dowd, Corrothers's former teacher, testified regarding his performance in school. Dowd oversaw a special program for students with learning difficulties. Many of the students read below level. The program focused on reading and allowed the students to attend cultural events. Corrothers was in the program for one year. Dowd stated he was a "passionate and energetic" student who loved art. Although Corrothers had poor test scores, Dowd thought he had potential to be a great student. She noted Corrothers had behavioral issues at school, resulting in parent conferences and referrals to receive academic and behavioral help. The school went through the procedures to have Corrothers tested to determine if he needed medication, but testing never occurred. Dowd's talks with Vonda about Corrothers went nowhere as Vonda wished to "leav[e] it up to Jesus."

thoroughly covered by the mitigation witnesses called to testify at trial.[9]  So Corrothers cannot show his counsel was deficient for failing to investigate these mitigating circumstances.  Nor can he show prejudice, as the potential mitigating evidence "would barely have altered the sentencing profile presented to the [jury]." *Chamberlin*, 55 So. 3d at 1054.  And without showing prejudice, he has no triable ineffective-assistance claim.

### 2.    *Psychologists and Psychiatrists*

¶19.    Also as part of this claim, Corrothers argues his trial counsel was deficient for not having Corrothers tested further.  Counsel did employ a psychologist, Dr. Joseph Angelillo, who tested Corrothers and testified at the sentencing hearing.  But Corrothers asserts Dr. Angelillo's evaluation was too general—counsel also should have had Corrothers specifically evaluated for "executive functioning."

¶20.    Executive functioning "is a person's ability to anticipate, problem-solve, and understand delayed gratification. The deficits inhibit one's ability to anticipate consequences, learn from mistakes, and respond in a rational and non-impulsive manner." *Dickerson v. State*, 175 So. 3d 8, 16 (Miss. 2015).  Corrothers presents the affidavit of Dr.

---

[9] The only exception is Corrothers's claim that his trial counsel should have investigated what happened to his half-brother Tim.  In her PCR affidavit, Corrothers's mother Vonda avers Tim, when he was twenty-one, took a trip to Africa with his Nigerian father and returned a different person.  Allegedly, Tim witnessed witchcraft while in Africa—a man was shot, died, and supposedly was brought back to life.  She claims the event triggered Tim to have psychotic episodes he had never exhibited before.  He later was diagnosed with schizophrenia, bipolar disorder, and other mental illnesses.  But according to Vonda's affidavit, all these events occurred while Corrothers was serving his ten-year sentence.  And Corrothers does not articulate how his half-brother's psychotic breakdown impacted him (Corrothers).  So he cannot show he was prejudiced by his counsel not investigating what happened to his half-brother and not presenting this evidence at his sentencing hearing.

10

Malcolm Spica, who conducted a neuropsychological examination of Corrothers in September 2015. Dr. Spica states Corrothers's results revealed a converging pattern of scores indicating severe difficulty with executive functioning and severe anxiety. To a reasonable degree of medical certainty, Dr. Spica states Corrothers's mental defect in executive control, particularly during times of pressure, was likely to produce significantly disorganized behavior and substantial lapses in judgment.

¶21. Based on this, Corrothers maintains defense counsel's failure to investigate and present evidence of his deficits in executive functioning constituted deficient performance. And this deficient performance prejudiced him, because there is a reasonable probability this evidence would have changed the outcome of the sentencing hearing. But "where defense counsel has sought and acquired a psychological evaluation for the defendant for mitigation purposes, counsel generally will not be held ineffective for failure to request additional testing." *Ross v. State*, 954 So. 2d 968, 1005 (Miss. 2007) (citing *Moore v. Parker*, 425 F. 3d 250, 254 (6th Cir. 2005)). Moreover, as with Corrothers's lay witnesses, we find Dr. Spica's findings would not have altered the psychological profile presented to the jury. *See Chamberlin*, 55 So. 3d at 1054.

¶22. At trial, "Dr. Angelillo described Corrothers as rebellious, cocky, a poor problem-solver, and testified that he might act out in anger 'when cornered.'" *Corrothers I*, 148 So. 3d at 291-92. Dr. Angelillo discussed in detail Corrothers's paranoia and anxiety. He stated Corrothers was immature because he had poor coping skills and could not deal with conflict resolution and emotional issues. And the personality test Dr. Angelillo administered

11

showed Corrothers had a hard time getting along with others and mistrusted others. Still, Dr. Angelillo opined Corrothers did not meet the criteria for incompetency or insanity, as he had an appreciation of wrong. And Dr. Spica's proposed expert testimony does not contradict this. While Dr. Spica found Corrothers has deficits in executive functioning, he did not state Corrothers is incapable of functioning properly.

¶23. Thus, we find the more specific executive-functioning testimony proposed by Corrothers's new expert would not have significantly differed or added to Dr. Angelillo's testimony. So Corrothers cannot show the outcome would have been different if an expert had been presented on executive functioning.

¶24. Similarly, Corrothers claims he should have been given a *psychiatric* exam, in addition to Dr. Angelillo's psychological evaluation. This exam, according to Corrothers's second new expert, would have explained the "psychological, psychiatric, biological, and environmental risks factors that formed his development." But the circumstances that led to Corrothers becoming the person he was were fully presented to the jury through Dr. Angelillo and the lay witnesses called.[10] In particular, Dr. Angelillo opined Corrothers's family environment and school were environmental factors that adversely affected Corrothers's behavior. Dr. Angelillo said the lack of a male figure negatively affected Corrothers. He noted Vonda's depression due to financial issues, physical health problems, and two sexual assaults could have impacted Corrothers. He also noted Vonda had borderline personality disorder and lacked the ability to make her own choices. Further, he

---

[10] *See* notes 3-7, *supra*.

was unsure whether Corrothers suffered from an untreated learning or behavioral disorder because no intervention occurred while Corrothers was in school.

¶25. A review of the trial transcript reveals counsel reasonably investigated Corrothers's background—including his psychological history—and the impact it had on Corrothers's development and behavior. So Corrothers cannot substantially show his counsel was deficient in this area or that Corrothers was prejudiced by an additional expert not testifying. *See* **Brown v. State**, 798 So. 2d 481, 498 (Miss. 2001) (denying relief based on failure to present additional psychiatric/psychological experts because the petitioner "ma[de] no showing that additional expert or psychiatric testimony would have resulted in a different sentence").

### 3. Effects of Prolonged Incarceration

¶26. In addition to his mitigation arguments, Corrothers insists his counsel was ineffective for not investigating and presenting evidence that he had been incarcerated—either in a juvenile training facility or adult prison—for half of his life. According to Corrothers, trial counsel should have presented to the jury evidence about the difficult conditions he would have faced as a young person in prison and how that would have impacted him.

¶27. But "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable[.]" **Foster v. State**, 687 So. 2d 1124, 1132 (Miss. 1996). And here, Corrothers has not shown counsel's decision *not* to focus on Corrothers's prolonged institutionalization and incarceration was anything other than strategic. Counsel would have been aware of this aspect of Corrothers's past through the

13

investigations of the mitigation specialists. But dwelling on Corrothers's juvenile record and previous imprisonment could have backfired. "[W]hen the defendant puts mitigating evidence before the jury during the penalty phase, the prosecution is allowed a counter-attack." *Finley v. State*, 725 So. 2d 226, 239 (Miss. 1998). By *not* focusing on Corrothers's living conditions while in juvenile or adult facilities, counsel kept the State from counter attacking with Corrothers's criminal history. *See, e.g., Ross*, 954 So. 2d at 1005 (where defense counsel's "good prisoner" evidence opened door for State's evidence that defendant was, in fact, a high-security prisoner because he had been caught with a hacksaw, had tried to escape, and had been making alcoholic beverages in prison). So Corrothers can show neither his trial counsel was deficient for not presenting this mitigation argument nor that emphasizing Corrothers's experiences in a juvenile training facility or adult prison would have led to a different outcome.

### B.      *Failure to Properly Instruct Jury*

¶28.    Next, Corrothers claims trial counsel "failed to reasonably ensure that jurors gave full effect to mitigating evidence." But the reason the jury was not instructed as Corrothers now believes they should have been was not due to any deficiency by his counsel. At trial, counsel presented four instructions on weighing mitigation evidence. The trial court rejected all four. And on direct appeal, this Court found no error in the judge's denial of these instructions. Instead, we found the mitigation-evidence instructions given to the jury were sufficient. *Corrothers I*, 148 So. 3d at 300-04. So Corrothers has no claim his counsel was deficient or that he was prejudiced by the instructions given.

14

## C. Failure to Object to Improper Argument

¶29.    Corrothers also claims his trial counsel was ineffective for failing to object to the State's improper arguments during the penalty phase.

¶30.    But we find neither of the arguments Corrothers cites was improper.  So Corrothers cannot show counsel was deficient for not objecting, nor can he show prejudice.  *See Spicer v. State*, 973 So. 2d 184, 201 (Miss. 2007)  ("Because the underlying issue has been found to be without merit, counsel cannot be held deficient for failing to object, nor can Spicer show prejudice.").

### 1. Comment on Corrothers's Lack of Remorse

¶31.    During closing argument, the State said "[i]t can only be mitigating if there is some accepting of responsibility of your action.  There has been none."   Corrothers asserts this was an improper statement about mitigation evidence, so his counsel should have objected.  But in *Doss v. State*, 709 So. 2d 369, 399 (Miss. 1996), during closing argument at the penalty phase, the State argued also against considering Doss's mitigation evidence and for considering Doss's lack of remorse.  And we held the prosecutor's comments did not exceed the limits of permissible argument.  *Id*. at 400 (citing *Berry v. State*, 575 So. 2d 1, 9 (Miss. 1990)).  *See also Jackson v. State*, 672 So. 2d 468, 493 (Miss. 1996) (holding that the defendant's remorse is encompassed in a "catch-all," nonstatutory mitigating factor).  We find the same here—the State's argument fell within the wide latitude allowed during closing argument.  So Corrothers cannot show his counsel's failure to object was deficient or that the failure to object prejudiced him.

15

## 2. *Comment on Evidence*

¶32. This wide lattitude does have limits. "[C]ounsel is clearly limited to arguing facts introduced in evidence, deductions and conclusions he or she may reasonably draw therefrom, and the application of the law to the facts." ***Taylor v. State***, 672 So. 2d 1246, 1266 (Miss. 1996). And according to Corrothers, his counsel failed to object when the State exceeded that limit by misleading the jury to believe Corrothers's fingerprints were found in Taylor's car. But our review of the transcript reveals the State properly limited its argument to the evidence presented and a reasonable deduction to be drawn from it.

¶33. Corrothers's fingerprints were not found in Taylor's car. A handgun, the murder weapon, was recovered from the car. But it did not have Corrothers's fingerprints on it either. Before results of the fingerprint testing were received, Investigator Mills asked Corrothers whether his fingerprints *would be* found on the gun.

¶34. Both defense counsel and the State brought up this interview during their respective closings. Corrothers's counsel emphasized how Corrothers told Investigator Mills—

> I didn't say I did it. Didn't say I killed him. Didn't say I wrecked the car even though investigator said well what if we find the finger prints on that gun. How did they get there. He said what? I don't know.

But the State argued the jury should view the interview differently—

> [I]f you listen to the interview closely, [Mills] says, "If we have finger prints on the gun how could you explain that?" And it's very interesting because in his response to that [Corrothers] explains how his finger prints could be on that gun. He describes the murder weapon. He describes the murder weapon that was found in the car. Coincidence? . . . [A]n hour into the interview, maybe more[,] he starts talking about how he was in a white car that night, trying to legitimately explain why his fingerprints would be in Taylor Clark's car because he didn't know.

16

Contrary to Corrothers's assertion, the State never said that Corrothers's fingerprints were found in the car or on the gun. Instead, both defense counsel and the State drew reasonable conclusions from the evidence the jury had heard about Corrothers's interview with Investigator Mills. So Corrothers cannot show his counsel's failure to object was deficient or that the failure to object prejudiced him.

### D. Cumulative Effect

¶35. In his final ineffective-assistance-of-counsel claim, Corrothers asserts the "cumulative effect" of his counsel's errors entitles him to relief. But for there to be a "cumulative effect," there first must be individual errors by counsel. And, as discussed above, Corrothers has not substantially shown any instance where his trial counsel was in error. *See Gray v. State*, 887 So. 2d 158, 173 (Miss. 2004) ("With no error to be found on the part of trial counsel in these enumerated instances, there can be no cumulative error[.]").

## II. Right to an Impartial Jury (Claim VIII)

¶36. In addition to his Sixth Amendment right-to-counsel argument, Corrothers also asserts his Sixth Amendment right to trial by an impartial jury also was violated. U.S. Const. amend VI. He claims one of the jurors was biased. As proof, he attached two affidavits to his PCR petition—one by his mother Vonda, and another by his cousin Makyia Sanders. Both claim they observed a female juror improperly communicating with Tonya Clark during the trial.[11]

---

[11] According to Vonda—

> During the trial, I noticed that a heavyset white female juror was communicating a lot of information to Tonya Clark when the jury would enter the courtroom. During the time the verdict was about to be read at sentencing, I noticed that this same juror said to Tonya Clark, "We got it."

¶37. The State asserts this claim is procedurally barred, because it was capable of being raised at trial and on direct appeal. *See* **Williams**, 669 So. 2d at 52. But under our heightened standard of review for death-penalty cases, we resolve "*all doubts . . .* in favor of the accused." **Batiste v. State**, 184 So. 3d 290, 292 (Miss. 2016) (emphasis in original) (citations omitted). And here, we simply cannot speculate whether Vonda and Sanders would have alerted Corrothers or his counsel immediately if they indeed observed the alleged improper contact. Instead, we are required to resolve this question in Corrothers's favor to find no procedural bar.

¶38. Since his claim is at least "procedurally alive," we find his allegation of improper juror contact warrants an evidentiary hearing. Where allegations of juror impartiality have been made, the United States Supreme Court "has long held that the remedy . . . is a hearing in which the defendant has the opportunity to prove actual bias." **Smith v. Phillips**, 455 U.S. 209, 216, 102 S. Ct. 940, 945, 71 L. Ed. 2d 78 (1982) (citing **Remmer v. United States**, 347 U.S. 227, 74 S. Ct. 450, 98 L. Ed. 654 (1954)). In light of Corrothers allegations, we find he is entitled to the opportunity to prove actual juror bias.

¶39. We grant Corrothers leave to proceed in the trial court with his PCR petition on this issue only.

### III. Right to a Fair Trial (Issues II and III)

---

And according to Sanders—

> I attended the trial. I remember seeing a juror, who was a white lady, smile and wink her eye at Taylor's mother during the trial. I thought that it was unusual for the juror to be allowed to do that. I would be able to identify the juror if I saw her today.

18

¶40. Corrothers argues his trial was unconstitutionally unfair based on Hickinbottom's testimony. On this issue, we deny him leave to proceed.

¶41. At trial, Hickinbottom identified Corrothers as the man who came to her door looking for Taylor on July 11, 2009. But in an affidavit executed six years later, she claimed she was "not totally sure what the man looked like because [she] could not see his face." Corrothers argues the affidavit shows Hickinbottom's in-court identification was unreliable and, thus, should not have been admitted. But Corrothers did not object to Hickinbottom's testimony as being unreliable, so this issue is waived. *See **Corrothers I***, 148 So. 3d at 300 (holding Corrothers's challenge on direct appeal to Tonya's in-court identification was waived due to Corrothers's failure to object). So the only procedurally available avenue to challenge Hickinbottom's testimony is through his related claim that Hickinbottom has recanted her trial testimony.

¶42. Corrothers asks for an evidentiary hearing to determine if Hickinbottom's recanted testimony mandates a new trial. But we find no hearing is warranted. Recanted testimony does not automatically entitle the defendant to a new trial. ***Williams v. State***, 669 So. 2d 44, 53 (Miss. 1996). Instead, "in a death penalty case, admission of perjured testimony mandates a new trial, *where there is a reasonable probability that a different result will be reached* in the new trial without the perjured testimony." ***Carr v. State***, 873 So. 2d 991, 998 (Miss. 2004) (emphasis in original) (quoting ***Williams***, 669 So. 2d at 53). Thus, even if Corrothers were able to prove Hickinbottom has recanted, he still could not show that "there is a reasonable probability that a different result will be reached" with her new testimony. ***Id.***

19

¶43. Hickinbottom was not the only one who identified Corrothers. Both Tonya and Joshua also identified Corrothers as the murderer. And they testified they came into much closer contact with him that night than Hickinbottom. On direct appeal, this Court found both Joshua's and Tonya's identifications were reliable and admissible. *Corrothers I*, 148 So. 3d at 298-300. So even without Hickinbottom's positive identification, the evidence still supports Corrothers being the man who lethally attacked the Clark family.

¶44. Moreover, Hickinbottom's new testimony is *consistent* with Corrothers's conviction. In her affidavit, Hickinbottom states she was "not totally sure" the man she saw was Corrothers. But she does not say the man she saw was not or could not have been Corrothers. While she "could not see his face," she "was able to see the man's figure and hair." And nowhere in her affidavit does she claim the man she saw had a different figure and hair than Corrothers.

¶45. Because Corrothers has failed to show a different outcome would have been reached had Hickinbottom testified according to her affidavit, we deny his request for leave to proceed with this claim in the trial court on his recanted-testimony claim.

IV. **Right to Be Free From Cruel and Unusual Punishment**
(**Issues IV and X**)

¶46. Finally, we address Corrothers's two claims that the death sentence imposed on him violates his Eighth Amendment right to be free from cruel and unusual punishment. U.S. Const. amend VIII.

*A.* *Proportionality*

20

¶47. Corrothers argues his death sentence was disproportionate when compared to similar cases. But on direct appeal, we compared Corrothers's death sentence with others, as required by Mississippi Code Section 99-19-105 (Rev. 2015). *Corrothers I*, 148 So. 3d at 324. Because we "have repeatedly upheld the death penalty [both] in cases involving capital murders committed during the commission of a robbery" and in "cases involving multiple capital murders," we found no disproportion. *Id.* (citations and internal quotations omitted).

¶48. As this Court has already considered the merits of this claim, Corrothers is procedurally barred from raising it again. *See* Miss. Code Ann. § 99-39-21(3) (Rev. 2015).

### B.  Method of Execution

¶49. Corrothers also argues the manner of execution set forth in Mississippi Code Section 99-15-51 (Supp. 2016) carries the unconstitutional risk of cruel and unusual punishment. Corrothers elaborates no further, except to acknowledge that, at the time he filed his PCR petition, Mississippi's three-part lethal-injection protocol was being challenged in both federal and state court. He raises this claim merely to "preserve" this issue, pending the outcome of that litigation.

¶50. But the United States Supreme Court has already addressed this issue sufficiently. The United States Supreme Court "has never invalidated a State's chosen procedure for carrying out a sentence of death as the infliction of cruel and unusual punishment." *Baze v. Rees*, 553 U.S. 35, 48, 128 S. Ct. 1520, 1530 (2008). The death penalty is constitutional. *Glossip v. Gross*, 135 S. Ct. 2726, 2732, 192 L. Ed. 2d 761 (2015) (citing *Baze*, 553 U.S. at 47, 128 S. Ct. at 1529). So "it necessarily follows that there must be a constitutional means

21

of carrying it out." *Id.* at 2732-33 (quoting *Baze*, 553 U.S. at 47, 128 S. Ct. at 1529). "And because some risk of pain is inherent in any method of execution, . . . the Constitution does not require the avoidance of all risk of pain." *Id.*, 135 S. Ct. at 2733. "After all, while most humans wish to die a painless death, many do not have that good fortune. Holding that the Eighth Amendment demands the elimination of essentially all risk of pain would effectively outlaw the death penalty altogether." *Id.* So challenging the State's *method* of execution on Eighth Amendment grounds requires more than asserting Section 99-15-51's procedures carry the risk of severe pain. It also requires "identify[ing] a known and available alternative method of execution that entails a lesser risk of pain." *Id.* at 2731.

¶51. In his PCR petition, Corrothers fails to identify an alternative method of execution that is "feasible, readily implemented, and in fact significantly reduce[s] a substantial risk of severe pain." *Baze*, 533 U.S. at 52, 128 S. Ct. at 1532. Thus, from the face of the petition, he has no Eighth Amendment method-of-execution claim.

## Conclusion

¶52. In *Corrothers I*, we carefully considered Corrothers's arguments and found no reversible error. Once again, we have scrutinized the trial record and Corrothers's PCR petition and exhibits. And for the above reasons, we find Corrothers is not entitled to pursue nine of the ten claims in his PCR petition. For one claim only—alleged juror bias—we grant Corrothers leave to proceed in the Lafayette County Circuit Court. Corrothers shall have sixty days from the issue of this Court's mandate to file his PCR petition.

¶53. **LEAVE TO SEEK POST-CONVICTION RELIEF GRANTED IN PART AND DENIED IN PART.**

**WALLER, C.J., DICKINSON AND RANDOLPH, P.JJ., KITCHENS, KING, COLEMAN, BEAM AND CHAMBERLIN, JJ., CONCUR.**