# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2018-DR-01525-SCT

*ABDUR RAHIM AMBROSE*
*a/k/a ABDUR AMBROSE*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 06/19/2015 |
| TRIAL JUDGE: | HON. ROGER T. CLARK |
| TRIAL COURT ATTORNEYS: | CROSBY PARKER |
| | LISA COLLUMS |
| | CHARLIE STEWART |
| | FRANK P. WITTMANN, IV |
| | RICHARD JOEL SMITH, JR. |
| | ROBERT C. STEWART |
| | GLENN F. RISHEL, JR. |
| | ANGELA BLACKWELL |
| | DANA CHRISTENSEN |
| | ALISON R. STEINER |
| COURT FROM WHICH APPEALED: | HARRISON COUNTY CIRCUIT COURT |
| ATTORNEYS FOR PETITIONER: | OFFICE OF CAPITAL POST-CONVICTION COUNSEL |
| | BY: ALEXANDER D. M. KASSOFF |
| |     TREASURE R. TYSON |
| ATTORNEY FOR RESPONDENT: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: LADONNA C. HOLLAND |
| NATURE OF THE CASE: | CIVIL - DEATH PENALTY - POST CONVICTION |
| DISPOSITION: | POSTCONVICTION RELIEF DENIED - 05/20/2021 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**COLEMAN, JUSTICE, FOR THE COURT:**

¶1.     A jury convicted Abdur Rahim Ambrose Sr. of the capital murder of Robert Trosclair. The jury also found that Ambrose's sentence should be death, and the Harrison County Circuit Court imposed the death sentence. We affirmed Ambrose's conviction and sentence on direct appeal. *Ambrose v. State*, 254 So. 3d 77 (Miss. 2018). Ambrose's motion for rehearing was subsequently denied on October 18, 2018, and his petition for writ of certiorari to the United States Supreme Court was denied on March 25, 2019. *Ambrose v. Mississippi*, 139 S. Ct. 1379 (2019) (mem.). Ambrose timely filed his application for postconviction relief on October 25, 2019. It is not well taken and is denied.

**FACTS**

¶2.     Ambrose and Trosclair had been friends for nearly a decade. Believing that Trosclair had broken into Ambrose's vehicle and taken items, Ambrose and two other men beat Trosclair to death. The fatal beating lasted nearly two hours. Ambrose and his cohorts punched, kicked, and stomped Trosclair until he was unrecognizable. Ambrose and the others then loaded Trosclair, who was still alive, into the back of a pickup truck, and Ambrose drove Trosclair to a second location where the three men continued to beat him relentlessly. At one point, Trosclair attempted to escape, but Ambrose chased him down. While Trosclair was lying on the ground, he was hit in the head several times with a fully inflated tire and rim. He was also beaten with a garden hose reel. Trosclair eventually became unresponsive. Sometime thereafter, the attackers bound the victim with a ratchet tow strap and dumped on the side of the road, where he was later discovered by a passerby.

¶3.     Trosclair was airlifted to the University of South Alabama Medical Center in Mobile, Alabama.  His brain was severely swollen and had shifted four millimeters to the left.  The forensic pathologist who performed Trosclair's autopsy testified that "multiple blunt trauma, multiple sharp wounds (including three stab wounds to the flank), and asphyxia by strangulation" were the injuries that caused Trosclair's death.  Trosclair suffered substantial head injuries, included hemorrhaging in the front and right side of the subgalea area, subdural hemorrhage, and hemorrhaging to the pons.  The pathologist determined that Trosclair had also been strangled based on "hemorrhages in the strap muscles and the hemorrhages in the eyes which correlate with that."  Trosclair had "diffuse superficial abrasions" all over his body.  Trosclair also suffered jaw and nasal-bone fractures and lacerations to the flank.  Trosclair never regained consciousness, and he was declared brain dead and removed from life support.

¶4.     At trial, the State presented three eyewitnesses to Trosclair's kidnapping and fatal beating.  In addition, Ambrose testified on his own behalf and admitted that he participated in the fatal beating.  Ambrose insisted, however, that he did not kidnap the victim and did not intend to kill him.  Ambrose's defense theory at trial was that he was criminally responsible as an accomplice to the events in question or, at most, guilty of a lesser homicide than capital murder.  Following the guilt phase of trial, the jury returned a verdict finding Ambrose guilty of capital murder.

¶5.     During the sentencing phase, the State reintroduced all evidence presented from the guilt phase before resting its case.  The defense presented testimony from nine of Ambrose's

friends and family members. Cumulatively, the mitigation witnesses testified that Ambrose grew up impoverished, faced many challenges as a youth, was not a violent person, regularly held a job, and loved and supported his children. The mitigation witnesses also testified that they loved Ambrose and that they would write and visit Ambrose in prison. The jury returned a verdict finding that Ambrose should receive the death penalty. The trial court then sentenced Ambrose to death.

## STATEMENT OF THE ISSUES

¶6. Ambrose raises the following issues:

I. Whether the investigation and presentation of mitigation evidence were constitutionally inadequate.

II. Whether the trial judge made rulings during voir dire that demonstrate impermissible gender bias, resulting in an unfair pool of prospective jurors.

III. Whether Mississippi's death penalty statute is arbitrary and capricious as applied.

## STANDARD OF REVIEW

¶7. The Court's review of Ambrose's application, from a procedural standpoint, is as follows:

> Leave is granted only if the application, motion, exhibits, and prior record show that the claims are not procedurally barred and that they "present a substantial showing of the denial of a state or federal right." Miss. Code Ann. § 99-39-27(5) (Rev. 2015). Well-pleaded allegations are accepted as true. *Simon v. State*, 857 So. 2d 668, 678 (Miss. 2003) (citing *Moore v. Ruth*, 556 So. 2d 1059, 1061-62 (Miss. 1990)).

> In capital cases, non-procedurally barred claims are reviewed using "'heightened scrutiny' under which all bona fide doubts are resolved in favor of the accused." *Crawford v. State*, 218 So. 3d 1142, 1150 (Miss. 2016)

4

(quoting *Chamberlin v. State*, 55 So. 3d 1046, 1049-50 (Miss. 2010)). "[W]hat may be harmless error in a case with less at stake becomes reversible error when the penalty is death." *Crawford*, 218 So. 3d at 1150 (quoting *Chamberlin*, 55 So. 3d at 1049-50).

*Ronk v. State*, 267 So. 3d 1239, 1247 (Miss. 2019).

## ANALYSIS

### I. Whether the investigation and presentation of mitigation evidence were constitutionally inadequate.

¶8. Ambrose asserts that his rights under the Sixth, Eighth, and Fourteenth Amendments were violated because trial counsel failed to conduct a thorough investigation and failed to present certain mitigating evidence to the jury.

¶9. The record before the Court shows that the defense attempted to humanize Ambrose during the penalty phase. Defense counsel delivered his opening statements by saying:

> I will tell you this, that I'm going to put on witnesses who will testify about his background, about his record, about what kind of person he is so you will get to know Rahim through these people. And the purpose of that is to convince you that Rahim has some value, and that he should not just be torn out of the community . . . to exterminate him. That he has value, and that he can be helpful in his life and in the lives of others.

¶10. Nine witnesses were called by the defense. The first witness called was Kimberly Turner, Ambrose's mother. She testified that Ambrose did well in school and never got into trouble. She explained that Ambrose's father was shot and killed and that she later married the man who had killed Ambrose's father. Turner testified that Ambrose was not lazy. He always had a job and was a hard worker. She told the jury that Ambrose was an excellent father to his three children, doing more than just providing support for them. She testified that Ambrose was not a violent person and did not have a temper, describing him as a

5

"mamma's boy." Finally, she told the jury that she would write to him in prison and that Ambrose could still contribute to the family.

¶11. The other witnesses, relatives and friends, testified in similar fashion, describing Ambrose as a nonviolent person, a loving father, and a hard worker. His aunt added that Ambrose grew up in poor living conditions with frequent adult parties. Ambrose's cousin testified about the years Ambrose had come to live with her family when Ambrose's mother moved to Florida with another woman. Ambrose's uncle, a pastor, testified that Ambrose had recently been baptized and was active in the church. Many described Ambrose as a responsible person with a dream of writing music. All of the witnesses stated that they would write and visit Ambrose in prison and expressed a desire for him to be spared the death penalty.

¶12. Before trial, defense counsel's mitigation investigation included employing a "mitigation expert." Trial counsel also had Ambrose evaluated by a psychologist pretrial. That psychologist, after making other relevant findings, concluded that Ambrose needed no further psychological evaluation.

¶13. Ambrose now accuses his trial counsel of failing to undertake a reasonable mitigation investigation, as required by the United States Supreme Court and the Mississippi Supreme Court. Ambrose's claim is grounded in a claim of ineffective assistance of counsel.

¶14. Substantively, ineffective-assistance-of-counsel claims involve:

> a two-pronged inquiry: the defendant must demonstrate that his counsel's performance was deficient and that the deficiency prejudiced the defense of the case. To establish deficient performance, a defendant must show that his attorney's representation fell below an objective standard of reasonableness.

> To establish prejudice, a defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the trial would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

*Ross v. State*, 954 So. 2d 968, 1003-04 (Miss. 2007) (citations omitted). A presumption exists that Ambrose's attorneys were competent. *Johns v. State*, 926 So. 2d 188, 194 (Miss. 2006) (citing *Hiter v. State*, 660 So. 2d 961 (Miss. 1995)).

¶15. "'Reasonableness' is based on 'prevailing professional norms.'" *Ronk*, 267 So. 3d at 1248 (quoting *Wiggins v. Smith*, 539 U.S. 510, 521 (2003)). "Our review is highly deferential to the attorney, with a strong presumption that the attorney's conduct fell within the wide range of reasonable professional assistance." *Ross*, 954 So. 2d at 1004 (citing *Howard v. State*, 853 So. 2d 781, 796 (Miss. 2003)).

¶16. Ambrose's trial counsel hired Stacy Ferraro to conduct a mitigation investigation. Ambrose states that Ferraro is an attorney and mitigation specialist who has more than eighteen years of experience in capital defense. Ferraro states in her affidavit that she began an investigation for Ambrose, but "[t]he trial team did not allow me to complete the mitigation investigation." She further states that, before parting, she "left the team an extensive list of witnesses who needed to be contacted and interviewed. The list was dated December 18, 2014 and contained approximately nineteen additional witnesses along with their contact information." Ferraro states that "[t]o my knowledge, these witnesses were not contacted and interviewed by any member of Ambrose's trial team." She further states:

> [I]t is likely I would have recommended experts in multiple fields—specifically in the fields of childhood trauma and childhood poverty

7

and neuropsychology. Such experts typically testify during the penalty phase of trials and present the long-term effects of poverty and trauma.

These long-term effects include, but are not limited to, neurological development in children as well as cognitive functioning and frontal lobe development which can all compromise decision-making abilities and cognitive functioning especially when those traumatic events occur in during early childhood.

In addition, I would have recommended an expert to produce a mapping of Ambrose's neighborhood and surrounding areas. Neighborhood mapping is often used to demonstrate the vast differences in income and inequality in the surrounding area. Areas are typically scored based on variables including poverty rates, housing vacancy, unemployment, and changes in the number of local businesses.

Ferraro admits that the defense team contacted an expert but opines that expert did "not possess the appropriate level of education [] or expertise in order to assist in the investigation or presentation of mitigating factors during the penalty phase of a trial. In fact, that expert only evaluated Rahim for competency." The crux of Ambrose's claim is that trial counsel was ineffective for failing to utilize all of the information obtained by the mitigation specialist and for failing to have Ambrose undergo a neuropsychological evaluation.

¶17. As the State points out, Ferraro's bill shows that she spent twenty-six hours summarizing notes from interviewing approximately twenty-five witness and various records. Ferraro's bill also shows that she met with Ambrose at least thirteen times between March 10, 2014, and November 24, 2014. Based on the fact that the trial court entered an order authorizing payment of Ferraro's $14,689.12 bill, trial counsel certainly possessed the fruits of Ferraro's labor when formulating sentencing phase strategy. Further, Ferraro's work was

8

in addition to the mitigation investigation performed by the Harrison County Public Defender's Office.

¶18.    Ambrose states that his postconviction team discovered powerful mitigating evidence, all of which is recorded in the affidavits attached to his motion. The evidence takes two basic forms: (1) affidavits from people who knew Ambrose growing up and (2) affidavits from two experts, one a neuropsychologist and the other a doctor of social work. Ambrose maintains that the evidence does more than describe a kid growing up in a dirty home with dirty clothes. He asserts that it shows the effects of a lifetime of extreme trauma that most people would find unimaginable.

¶19.    The affidavits from those who knew Ambrose tell of his poor and unkempt living conditions growing up and the reputation of the neighborhood where he grew up. Generally, they provide information that was presented to the jury, describing poverty and a lack of structure. The affidavits also provided information regarding the hardships Ambrose endured as a child, from living in different places to being raised by the man who had killed his father. Again, the information is cumulative to evidence presented to the jury. The only noncumulative allegation raised in the affidavits is that Ambrose's stepfather beat Ambrose, his mom, and his siblings.

¶20.    Marian Swindell, PhD, a doctor in social work, "determined there is a possibility that certain identified mitigating factors, in combination, did indeed impair Ambrose's normal mental capacity to make rational judgements [sic], control his behavior, and understand the consequences of his actions on April 7, 2013." Dr. Swindell recommended that "[f]urther

inquiry into that possibility with the appropriate experts is warranted and advised." Dr. Swindell's final recommendation was: "1) a neuro-psychological or neuro-psychiatric evaluation be performed to assess the neurological trauma/insult [Ambrose] experienced as a result of physical abuse to the skull, head, and neck area and abuse of illicit substances"; and "2) continued mitigation biopsychosocial research and assessment with [Ambrose] into cultural desensitization and familial attachment patterns."

¶21. The report provided by Robert G. Stanulis, PhD, who is licensed to practice psychology and neuropsychology, listed numerous traumatic events that Ambrose endured during his childhood and as an adult. Dr. Stanulis stated as follows:

> This evaluation finds strong evidence of psychological and neuropsychological dysfunction that has significant forensic implications for both the guilt and sentencing phases of the trial. First, Mr. Ambrose's history of severe and ongoing adverse and traumatic events as a child and adult makes it clear that he has symptoms related to termed Trauma and Stress Related Disorders. In addition, he has neuropsychological evidence of brain dysfunction that notably involves executive control. It is well known that complex trauma such as experienced by Mr. Ambrose can result in symptoms of PTSD that include "persistent and exaggerated negative beliefs about the world" as well as "irritable behavior and angry outbursts (with little or no provocation) typically expressed as verbal or physical aggression toward people or objects . . . ." Hence the rage and aggression that is described at the time of the instant offense could have been explained as symptoms of trauma rather than a matter of choice and character.
>
> Stress is known to change the brain in ways that negatively impact memory and "increase[] fear and aggression." ("Stress Effects on Structure and Function of Hippocampus," Laboratory of Neuroendocrinology, Rockefeller University 2019.) In addition, his neuropsychological dysfunction, especially in the area of executive control and emotional regulation and modulation would help explain how such a seemingly minor event as the theft from his car resulted in such an overwhelmingly emotional reaction that was the instant offense.

Other psychological and cultural factors also likely played a role. These include the long history of solving conflict by "squaring off" and the sense of betrayal by the victim's stealing from Mr. Ambrose.

Overall, this evaluation finds compelling psychological and neuropsychological evidence that Mr. Ambrose's ability to make rational judgements and control his emotions and behavior were severely compromised at the time of the instant offense. In short, his behavior and emotional over-reaction were driven by his history of trauma and powerful psychological and neuropsychological factors such that his actions were not the product of rational thought or under his complete behavioral control. To be sure, this did not rise to a mental defense, but is a more accurate explanation of his emotional and behavioral presentation than a simple decision to use lethal violence.

The second forensic implication is that Mr. Ambrose's history of trauma, poverty, and neglect resulted in psychological and neuropsychological deficits that are clearly mitigating. In addition to providing an explanation for the instant offense beyond it being a simple act of deadly aggression in response to minor provocation, this evaluation finds evidence for a number of variables that are mitigating. These include his history of extreme poverty; neglect; abuse; severe and frequent trauma as and child an adult; and psychological and neuropsychological deficits. In addition, evidence of his prosocial attitudes and behavior were not assessed for trial.

It is also important to note that neuroimaging and quantitative EEG (QEEG) would have been recommended had Mr. Ambrose underwent neuropsychological evaluation prior to trial. Neuroimaging is the production of images of the brain using magnetic imaging or computerized tomography. QEEG is a computer assisted mathematical processing of EEG data that is used as a "tool to improve clinical diagnosis, evaluation" of a variety of clinical conditions including "encephalopathies, delirium, learning disabilities, attention disorders, mood disorders, (and) ICU monitoring and dementia." (The Clinical Use of Quantitative EEG in Cognitive Disorders", Kanda et.al.; Dementia and Neuropsychologia, 2009.) Both of these methods provide other data useful in assessing the integrity and function of the brain.

¶22. Ambrose's ineffective assistance of counsel claim is similar to that recently discussed by the Court in *Walker v. State*, 303 So. 3d 720 (Miss. 2020). Alan Dale Walker was convicted of the capital murder of Konya Edwards during the commission of sexual battery,

11

and he was sentenced to death. *Walker v. State*, 671 So. 2d 581, 587 (Miss. 1995). He also was convicted of forcible rape and kidnapping for which he was sentenced to thirty and thirty-five years, to run consecutively. *Id.* On a successive application for leave, the Court remanded Walker's case for a hearing to determine whether his trial counsel had been ineffective in searching for and presenting mitigation evidence during the penalty phase of the trial and whether Walker had been prejudiced. *Walker*, 303 So. 3d at 723. The Court affirmed the trial court's denial of relief. *Id.* at 729.

¶23. Walker's trial counsel testified at the postconviction-relief hearing, although his memory had been affected by a stroke suffered after Walker's trial. *Id.* at 727. As the trial court noted, the defense strategy during sentencing was to "humanize" Walker. *Id.* In order to do so, the defense called witnesses in mitigation to testify that Walker had a supportive family, loved his daughter, and risked his own life to save the life of a child. *Id.*

¶24. The trial judge considered the report of Dr. Henry Maggio, who examined Walker for competency to stand trial. *Id.* Dr. Maggio found no defect of intellect, memory, or judgment in Walker. *Id.* The trial judge found that Dr. Maggio's report provided reasonable grounds for trial counsel to forego additional psychological testing before sentencing. *Id.*

¶25. In response to Walker's claim, the State relied on *United States v. Bernard*, 762 F.3d 467, 476 (5th Cir. 2014), which holds that counsel's failure to present testimony from a neuropsychologist that compromised the trial strategy of humanizing the defendant did not amount to ineffective assistance of counsel.

¶26. The trial judge ultimately determined that the strategy of Walker's defense was reasonable and, "[a]t most, Walker's post-conviction counsel presented an alternative reasonable strategy but failed to show that [trial counsel's] strategy was not reasonable." *Walker*, 303 So. 3d at 727.

¶27. Also of note, as pointed out in Presiding Justice Kitchens's separate opinion in *Walker*, Walker's trial attorney testified that because he had thought Walker would be offered a plea deal until a few days before trial, he conducted no penalty-phase investigation before that point. *Id.* at 731 (Kitchens, P.J., concurring in result only). Defense counsel called four witnesses during mitigation: Walker's former employer, his half-brother, his half-sister, and his mother.

¶28. In contrast, Ambrose's trial counsel hired a mitigation investigator, and an investigation was performed in preparation for the sentencing phase, and, as stated before, nine witness were called to testify. Like Walker, Ambrose also had an expert that determined he was competent. Further, as in *Walker*, it was the strategy of Ambrose's trial counsel to humanize Ambrose. We find that Ambrose's postconviction counsel now presents an alternative reasonable strategy. However, that does not prove that Ambrose's trial counsel's strategy was not reasonable.

¶29. Additionally, Ferraro stated in her affidavit that "it is *likely* [she] would have recommended experts in multiple fields—specifically in the fields of childhood trauma and childhood poverty and neuropsychology." (Emphasis added.) She does not state that she definitively would have made such a recommendation. Even if she would have, from her

13

statement, one can surmise that Ferraro did not make such a recommendation to Ambrose's trial counsel while employed as the mitigation investigator.

¶30.    In *Wiggins*, 539 U.S. at 521, the petitioner claimed that he had received ineffective assistance of counsel because his attorneys failed to investigate and present mitigating evidence at his sentencing.  Quoting *Strickland v. Washington*, the Court reiterated that "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Wiggins*, 539 U.S. at 521–22 (quoting *Strickland v. Washington*, 466 U.S. 668, 690-91 (1984)).  In *Crawford v. State*, we relied on *Wiggins* and held that "a court is to determine whether counsel exercised reasonable professional judgment in conducting its investigation based on an assessment of the prevailing professional norms, including a 'context-dependent consideration of the challenged conduct as "seen from counsel's perspective at the time."'" *Crawford v. State*, 867 So. 2d 196, 217 (Miss. 2003) (quoting *Wiggins*, 539 U.S. at 511). Additionally, "every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Bell v. Cone*, 535 U.S. 685, 698 (2002) (alteration in original) (internal quotation marks omitted) (quoting *Strickland*, 466 U.S. at 689).

¶31.    Ambrose faults his trial counsel for not presenting all of the evidence that was discovered during the mitigation investigation.  However, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable[.]" *Strickland*, 466 U.S. at 690; *Corrothers v. State*, 255 So. 3d 99, 109

14

(Miss. 2017) (alteration in original) (internal quotation marks omitted) (quoting *Foster v. State*, 687 So. 2d 1124, 1132 (Miss. 1996)). We find that the investigation was thorough and that the psychologist employed by the defense team concluded that Ambrose needed no further psychological evaluation. Therefore, trial counsel's performance regarding mitigation was not deficient, and the ineffective-assistance-of-counsel claim is without merit.

    **II.**     **Whether the trial judge made rulings during voir dire that demonstrated impermissible gender bias, resulting in an unfair pool of prospective jurors.**

¶32. In *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 129 (1994), the United States Supreme Court was faced with the question of whether intentional discrimination on the basis of gender was prohibited when the State used nine of its ten peremptory strikes to remove male jurors, resulting in an all-female jury. The Supreme Court held that "gender, like race, is an unconstitutional proxy for juror competence and impartiality" and stated, "[a]ll persons, when granted the opportunity to serve on a jury, have the right not to be excluded summarily because of discriminatory and stereotypical presumptions that reflect and reinforce patterns of historical discrimination." *Id.* at 129, 141-42.

¶33. In today's case, the Court is not dealing with gender discrimination through the use of peremptory strikes, stacking the jury with one gender or another. The issue Ambrose raises is whether the trial court provided equal treatment to potential jurors, male and female, who were seeking to be excused from jury duty on the basis of financial hardship.

¶34. During voir dire, the issue of financial hardship arose. Six jurors asked to be excused for financial hardship—three men and three women. An additional woman mentioned that

she would lose money if she were chosen to serve, but she stated that was not her primary concern. Ambrose asserts that the trial judge exhibited gender-based bias by treating the requests to be excused for financial hardship differently based on gender. Ambrose states that the trial judge asked leading questions to the male candidates regarding financial hardship and that each was excused from jury service for that reason. Ambrose further asserts that, of the three women who asked to be excused for financial hardship, one woman was excused for it, but the trial judge specifically stated to two women that everybody must make some kind of sacrifice. Ambrose maintains that the female jurors ultimately did not serve, but the judge made a point to note that they were not excused due to financial hardship. Ambrose states that another woman was released but only after the court heard that jury service would cause a financial hardship for both her and her husband.

¶35. Ambrose claims that he is entitled to a new trial because the trial court "demonstrate[d] impermissible gender bias" in questioning potential jurors who sought to be excused based on the financial-hardship exemption. The issue was capable of being raised at trial and/or on direct appeal, and it is now procedurally barred. Miss. Code Ann. § 99-39-21(1) (Rev. 2020); *see also* **Ronk v. State**, 267 So. 3d at 1288 (Miss. 2019). Notwithstanding the procedural bar, Ambrose acknowledges that no controlling legal authority or persuasive legal authority supports the issue, claiming it is an issue of first impression.

¶36. Even if the Court were to entertain the issue on the merits, despite the procedural bar, all of the potential jurors concerned in the issue who sought to be excused ultimately were

16

excused.  None of them served on the jury, and Ambrose has not shown that his trial was unfair as a result.  So, even if the Court were to assume that the trial court exhibited bias in the manner of questioning the potential jurors, Ambrose has failed to establish a legal claim that would warrant postconviction relief.  Accordingly, his argument fails.

### III. Whether Mississippi's death penalty statute is arbitrary and capricious as applied.

¶37. On direct appeal, Ambrose raised numerous issues challenging the constitutionality of the death penalty, including: (1) whether the failure to include *mens rea* factors or aggravating circumstances in the indictment renders the death sentence unconstitutional, (2) whether Mississippi's statutory death penalty scheme is unconstitutional for piecemeal reasons (specifically, that the death penalty scheme is being applied in a discriminatory and irrational manner against males, poor persons, and defendants accused of killing white victims), (3) whether Mississippi's capital statutory scheme permitting the imposition of a death sentence violates the Eighth Amendment *in toto*, and (4) whether the death sentence in his case was constitutionally and statutorily disproportionate. *Ambrose*, 254 So. 3d at 149-52.  The Court found no merit to the claims. *Id.*

¶38. Now, Ambrose asserts that Mississippi's death penalty, as applied, is inherently arbitrary and capricious.  Like the aforementioned issues, the present issue was capable of being raised on direct appeal, and it is now barred.  Miss. Code Ann. § 99-39-21(1).  "Res judicata also extends to those claims that could have been raised in prior proceedings but were not." *Brown v. State*, 306 So. 3d 719, 730 (Miss. 2020) (citing *Ronk*, 267 So. 3d at 1288); *Little v. V. & G Welding Supply, Inc.*, 704 So. 2d 1336, 1337-38 (Miss. 1997)).

17

Notwithstanding the procedural bar, the issue is also without merit. As the Court stated in Ambrose's direct appeal, "[t]he Supreme Court has 'time and again reaffirmed that capital punishment is not *per se* unconstitutional." *Ambrose,* 254 So. 3d at 149 (quoting *Glossip v. Gross*, 135 S. Ct. 2726, 2739 (2015)).

¶39.    In support of his new challenge to the constitutionality of Mississippi's death penalty statute, Ambrose relies heavily on Justice Breyer's dissent in *Glossip*. 135 S. Ct. 2726, 2755–80 (2015) (Breyer, J., dissenting). Justice Breyer discussed the discrepancies in the imposition of the death penalty. *Id.* He noted that imposition of the death penalty depends heavily on geography, even within death-penalty states. *Id.* at 2761.

¶40.    In *Ronk*, the Court addressed the very issue. Like Ambrose, Ronk relied heavily on Justice Breyer's dissent in *Glossip.* Ronk argued that "since October 1976, 57 of Mississippi's 82 counties have accounted for all 213 death sentences. Of the 57, 9 account for almost half of all death sentences. Harrison County, in which Ronk was convicted and sentenced, has had the most death sentences – 29." *Ronk*, 267 So. 3d at 1288. Here, Ambrose argues that 216 death sentences have now been rendered since October 5, 1976, and "Harrison County, where Mr. Ambrose was tried and sentenced to death, had the most of all—thirty death sentences."

¶41.    In addressing Ronk's claim, the Court stated:

> We have held that statistical evidence is insufficient to establish that Mississippi's death-penalty scheme is applied in an irrational, discriminatory manner in violation of either the United States or Mississippi Constitutions. *Galloway v. State*, 122 So. 3d 614, 680–81 (Miss. 2013). Instead, defendants or petitioners must show "the decision makers in [their] case acted with

18

discriminatory purpose." ***Id.*** at 681 (citing [***McCleskey v. Kemp***, 481 U.S. 279, 292 (1987)]).

In addition, Justice Breyer's dissent in ***Glossip*** is not the law. The Supreme Court has not held that capital punishment is unconstitutional. Under the Supremacy Clause, we "cannot interpret the federal Constitution to be more restrictive than has the Supreme Court on issues that Court has directly addressed." ***State v. Bush***, 244 Ariz. 575, 423 P. 3d 370, 392–93 (2018) (citations omitted). Nor can we anticipate what the Supreme Court may decide in the future. ***Id.*** at 393 (citations omitted). So no basis supports our declaring that Mississippi's capital scheme violates the United States Constitution. *See **id**.*

***Id.*** (first alteration in original).

¶42.    Since the Court's ruling in ***Ronk***, the law has not changed.  While claims may be excepted from the waiver bar "upon a showing of cause and actual prejudice," Miss. Code Ann. § 99-39-21(1), like Ronk, Ambrose cannot show either.

## CONCLUSION

¶43.    Because Ambrose's claims are procedurally barred and/or fail to make a substantial showing of the denial of a state or federal right, his application for postconviction relief or, alternatively, for leave to proceed in the trial court is denied.

¶44.    **POSTCONVICTION RELIEF DENIED.**

    **RANDOLPH, C.J., KITCHENS AND KING, P.JJ., MAXWELL, BEAM, CHAMBERLIN, ISHEE AND GRIFFIS, JJ., CONCUR.**