660 So.2d 961 (1995)
Tracy D. HITER
v.
STATE of Mississippi.
No. 92-KA-00398-SCT.
Supreme Court of Mississippi.
June 22, 1995.
Rehearing Denied September 21, 1995.
*962 A. Lee Abraham, Jr., Abraham & Associates, Greenwood, for appellant.
Michael C. Moore, Atty. Gen., Jackson; Jeffrey A. Klingfuss, Sp. Asst. Atty. Gen., Jackson, for appellee.
Before HAWKINS, C.J., and SULLIVAN and McRAE, JJ.
SULLIVAN, Justice, for the Court:
On March 11, 1992, Tracy D. Hiter was indicted for the murder of her husband Richard "Bubba" Hiter. Trial convened on April 8, 1992, in the Bolivar County Circuit Court, and the jury subsequently returned a verdict of guilty as charged. She was sentenced to a term of life imprisonment in the custody of the Mississippi Department of Corrections. On April 16, 1992, the trial court denied Hiter's post-trial motion for a judgment notwithstanding the verdict or for a new trial. The trial court entered an order on the same day granting bail in the amount of $10,000 pending her appeal to this Court.

FACTS
Richard Hiter a/k/a "Bubba" and his wife, Tracy Hiter, planned to spend the evening of Tracy's birthday watching movies together at home. Late in the afternoon of his wife's birthday, September 20, 1991, Bubba promised that he would be home shortly from his friend Ray's house. He never returned home, and she was subsequently unable to contact him. Bubba had instead driven into Benoit, Mississippi where he had parked his vehicle next to Frankie Kimble's car outside of Lillie's Cafe. Kimble had three passengers with him in his car: Stanley Adams ("Stanley"), Jerome Adams ("Jerome"), and Nathaniel White. Kimble had backed his car into a parking space so that it faced the street. Bubba was the sole occupant of his own vehicle which was parked in the opposite direction. They were passing a pint of whiskey between the cars as they talked and listened to the radio.
Stanley and Kimble exited the car in order to purchase some more liquor from a store located across the street. About this time, Tracy drove up and parked her car in the space on the other side of her husband's vehicle, leaving it in the middle of the other two cars. Stanley was standing on the sidewalk when she arrived. Kimble was conversing with Roosevelt Nelson and Woodrow Anderson, who were also standing outside of Lillie's Cafe at this time. Jerome and White remained in the backseat of Kimble's automobile. Tracy stepped out of her vehicle and placed her and Bubba's four year old son, Brent, into the back seat of Bubba's car. Bubba removed the child from his car and carried him back to his wife's car where an argument ensued.
Stanley testified that Tracy was furious from the moment she first arrived. White claimed that Tracy was angry about the drinking. White testified that the couple argued for a few minutes while Tracy sat in her car and Bubba stood outside. He said that Bubba climbed into her car and proceeded to restrain her arms as the argument continued. He testified that Tracy shot her husband after he climbed back out of the car. He maintained that Bubba was stepping backwards, facing his wife, immediately before being wounded.
Jerome claimed that Tracy revealed the gun after Bubba ordered her to go home. He said that Bubba stepped backwards away from the car and stated, "You going to shoot *963 me? Go ahead" immediately before Tracy pulled the trigger. He claimed that neither the husband nor wife struck one another during the argument.
Kimble said that Bubba restrained Tracy's arms in order to snatch her car keys. He did not hear most of their argument, but he heard Tracy say as Bubba walked away, "God damn it, Bubba, I'm sick of this." He thought Bubba was shot in his side by his wife as he began to turn around to face her. Kimble also never once observed Bubba strike Tracy during the argument. Nelson heard Tracy scream, "You don't mean me no good. You don't stay home with me, and Bubba, I'm just tired of you."
Tracy testified that she decided to drive to a site on the river called Uncle Joe's Landing after her husband failed to return home. She maintained that she put the loaded .25 automatic in her pocket for the purpose of protection. She placed the gun on the front seat after the gun repeatedly fell out of her pocket onto the car seat. As she drove towards Bolivar, she saw Bubba's car parked near the four way stop in Benoit.
Tracy testified that she stopped merely to ask her husband to babysit Brent. They swapped the child back and forth because he refused to keep the child. Bubba ordered her not to go anywhere as he attempted to remove the keys from the ignition. He subsequently twisted the keys out of her hand. Tracy said that her finger was cut in the process. She testified that he then reached into the car and squeezed her neck until she could not breathe. She smelled the alcohol on her husband's breath at this point. She said that Bubba exclaimed, "Do you understand dead, Bitch?" as he pulled her from the vehicle by her throat.
Tracy said that she grabbed the gun as Bubba pulled her from her car. She alleged that he pushed her back against the car, stepped back a few steps, and threatened to beat her to death in front of everyone. She testified that he raised his fist as if he was going to strike her in the stomach. She insisted that she was very scared because Bubba had been encouraging her to have an abortion after recently learning that she was pregnant. She explained that this was the reason she put the gun in her right hand and pulled the trigger. She claimed that Bubba had been violent on several occasions prior to this incident, and that he had a drinking problem.
Tracy yelled for someone to call 911 following the episode. She began crying and freely surrendered the .25 automatic to Kimble at his request. All of the State's witnesses said that the defendant failed to assist her husband after he was injured. Tracy disagreed, testifying that she aided him by attempting to prevent his lungs from collapsing by placing her hand over the wound. She was an EMT at Delta Medical Center before she quit her job after becoming pregnant again.
Clarence Johnson, the Police Chief of Benoit, Mississippi, heard the gunshots at approximately 5:00 p.m. while at a nearby service station. He drove to the scene and discovered a crowd of people surrounding Bubba Hiter, who was lying on the pavement. Tracy hysterically inquired if anyone knew CPR. Before driving the victim to the hospital, Kimble gave the .25 automatic to Officer Johnson. Officer Johnson accompanied Tracy to the Benoit Town Hall, where they alerted the hospital and the sheriff's department that someone had been critically injured. Officer Johnson gave the pistol to Toby Nokes of the Bolivar County Sheriffs Department, who had already been acquainted with Bubba. Officer Nokes was of the opinion that Bubba had a drinking problem.
Reverend Robert Bingham, a local minister and registered EMT at Delta Medical Center, initially stopped at the scene of the crime to provide assistance. He knew the husband and wife from having worked at the hospital. He maintained that Tracy was extremely upset after the shooting. He subsequently cared for their child until the grandparents picked him up later that day. Bubba had complained to Bingham just four days earlier at work that Tracy's pregnancy would soon force him to get a second job.
The victim was in shock and immediately taken to surgery upon arrival at Delta Medical Center. Dr. Phillip Doolittle said that the bullet had entered near the center of the *964 abdomen directly below the xiphoid. The aorta, the middle colonic artery and the portal vein were sutured, and most of the colon was removed. There was also an injury to his pancreas. Dr. Doolittle did not expect him to survive more than twelve hours.
Bubba Hiter spent most of the next five months in the intensive care unit under the care of many specialists. He was nourished through special intravenous lines because of intestinal injuries, but his caloric intake remained poor. He suffered multiple infections, and the hospital administered multiple transfusions during this period. His final cause of death was heart failure, which was directly related to the multiple number of infections incurred as a direct consequence of the initial gunshot wound.

I.

WAS THE VERDICT AGAINST THE OVERWHELMING WEIGHT OF THE EVIDENCE?
The trial court must grant a new trial when the interest of justice so requires, or where the verdict is contrary to the weight of the evidence. Miss.Unif.Crim. R.Cir.Ct.Prac. 5.16. The State must produce a greater amount of evidence in its favor to withstand a motion for a new trial, as opposed to a motion for a judgment notwithstanding the verdict. May v. State, 460 So.2d 778, 781 (Miss. 1984). On appeal, this Court will not grant a new trial unless convinced that the verdict is so contrary to the overwhelming weight of the evidence that, to allow it to stand, would be to sanction an unconscionable injustice. Johnson v. State, 642 So.2d 924, 928 (Miss. 1994); McNeal v. State, 617 So.2d 999, 1009 (Miss. 1993); Groseclose v. State, 440 So.2d 297, 300 (Miss. 1983). This Court must accept as true the evidence which supports the verdict, and a reversal is warranted only where the trial court abused its discretion by denying the movant a new trial. Johnson, 642 So.2d at 928.
Hiter argues that the record is replete with inconsistencies and contradictions which undermine confidence in the weight of the evidence supporting the verdict. Hiter attacks the credibility of several of the witnesses to the shooting. She contends that Nathaniel White and Jerome Adams were not credible witnesses because they could not have accurately seen or heard the events they claimed to have witnessed from the back seat of Kimble's car. White, however, testified that the only portion of the argument he overheard concerned Tracy's inquiry about Bubba's drinking. The remaining portion of his testimony concerned actions by the couple which were conspicuous to everyone in the area at the time. The couple's shuffling of the baby from car to car, or Tracy's act of stepping from the car, raising the pistol and shooting Bubba were highly visible actions. His testimony that he observed these actions from inside Kimble's car was certainly not an impossibility. The same is true of Jerome's testimony. His location during the shooting and his testimony of the events were not so contradictory or inconsistent that his testimony was inherently unreliable.
For the same reason, we find that the remaining evidence offered by the prosecution was not completely untrustworthy as Hiter suggests. All of the prosecution witnesses observed different aspects of the argument from different locations. The testimony of each witness is consistent with having only seen a portion of the argument, but all of the testimony combined is nevertheless supportive of the jury's determination that Hiter was guilty of murder. The fact that some witnesses may have admitted they were not paying attention or that they may not have been in a position to observe the entire episode goes to the weight and credibility of the witnesses' testimony. The jury must be left to resolve matters regarding the weight and credibility of the evidence. McClain v. State, 625 So.2d 774, 778 (Miss. 1993). It is enough that the conflicting evidence presented a factual dispute for jury resolution. Shannon v. State, 321 So.2d 1, 2 (Miss. 1975). As the record presents a factual dispute as to the circumstances of the homicide, we conclude that the verdict was not so contrary to the weight of the evidence that the trial judge abused his discretion in denying the request for a new trial.

*965 II.

WAS THE DEFENDANT DENIED HER SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL BY COUNSEL'S FAILURE TO REQUEST A MANSLAUGHTER INSTRUCTION, AND HIS FAILURE TO OBJECT TO PREJUDICIAL AND INFLAMMATORY REMARKS MADE IN THE PROSECUTOR'S CLOSING ARGUMENT?
In order to prevail on a claim of ineffective assistance of counsel, a defendant must prove that his attorney's performance was deficient, and that the deficiency was so substantial as to deprive the defendant of a fair trial. Strickland v. Washington, 466 U.S. 668, 687-96, 104 S.Ct. 2052, 2064-69, 80 L.Ed.2d 674 (1984); Wilcher v. State, 479 So.2d 710, 713 (Miss. 1985); Stringer v. State, 454 So.2d 468, 477 (Miss. 1984). The deficiency and any prejudicial effect are assessed by looking at the totality of circumstances. Carney v. State, 525 So.2d 776, 780 (Miss. 1988); Read v. State, 430 So.2d 832, 839 (Miss. 1983).
Hiter first complains that her attorney was deficient in failing to request a manslaughter instruction. The analysis begins with the strong but rebuttable presumption that counsel's conduct fell within the wide range of reasonable professional assistance. Carney, 525 So.2d at 780; Gilliard v. State, 462 So.2d 710, 714 (Miss. 1985). Appellate review of counsel's performance is "highly deferential." Strickland, 466 U.S. at 689, 104 S.Ct. at 2065.
It is clear from the record of facts that there was an evidentiary basis for a manslaughter instruction. Despite the strong evidentiary basis for the submission of such an instruction, it is equally clear from the record that counsel purposefully prevented the jury from considering the lesser included offense. When questioned by the court about a potential request for a manslaughter instruction, defense counsel stated, "There's no request for one." We find that this reply was the equivalent of an affirmative demand that the jury be denied a jury instruction on the crime of manslaughter.
Counsel's decision to refuse a manslaughter instruction, coupled with his decision to employ a defense based entirely on self-defense, was apparently his chosen strategy of representation. Attorneys are permitted wide latitude in their choice and employment of defense strategy. Edwards v. State, 615 So.2d 590, 597 (Miss. 1993). In Faraga v. State, 514 So.2d 295, 308 (Miss. 1987), cert. denied, 487 U.S. 1210, 108 S.Ct. 2858, 101 L.Ed.2d 894 (1988), this Court held that the defense's strategy of conceding murder but arguing against capital murder did not constitute ineffective assistance of counsel. See Woodward v. State, 635 So.2d 805, 808-09 (Miss. 1993) (finding similar strategy within range of competent representation). Hiter's defense appeared to follow the opposite route. Her defense strategy left the jury with no middle ground. Instead, it forced the jury to either convict the mother and wife of murder or to conclude that her actions were justified as self-defense. We find that Hiter has failed to rebut the presumption that this chosen strategy of defense was sound or to demonstrate that her attorney failed to provide her with professional assistance. Consequently, there is no Sixth Amendment violation in the case at hand for refusing a manslaughter instruction.
Hiter next complains of her attorney's failure to object to statements made by the prosecution in their closing argument. The following statements were made by the prosecution in closing:
Then you can see that she was angry, and she knew exactly what she was doing when she shot Bubba, and she knew exactly where she was shooting him.
Now, Bubba is not here. The only two people who know exactly what happened inside that car is Tracy Hiter and Bubba, and Bubba's not here, and he can't testify today. The only two people that know whether or not he wanted her to get an abortion is Bubba and Tracy, and Bubba's not here, and he can't tell you how he felt about the baby that she's carrying.
* * * * * *
Does Bubba Hiter deserve to die because she smelled the alcohol? She told *966 you a number of things about her relationship with Bubba and about his feelings and about her feelings, but as I told you, Bubba is not here. He can't tell you his side of the story.
Attorneys are given wide latitude in arguing their cases to the jury. Ivy v. State, 589 So.2d 1263, 1266 (Miss. 1991). On the other hand, the prosecutor is not permitted to use tactics which are inflammatory, highly prejudicial and reasonably calculated to unduly influence the jury. Acevedo v. State, 467 So.2d 220, 226 (Miss. 1985); Forrest v. State, 335 So.2d 900, 903 (Miss. 1976); Craft v. State, 271 So.2d 735, 737 (Miss. 1973). The remarks made by the prosecution clearly fell within the allowable scope of closing argument. The statements merely stated a fact which had been established at trial by the defendant's own admission. Bubba was, in fact, not present at trial to explain the events of that afternoon because Tracy shot him. We find it reasonable for the prosecutor to argue that the victim was no longer in existence as this was a murder trial where the jury was required to determine whether the killing was justified. It was not overly prejudicial or inflammatory since the prosecution was essentially urging the jury to reconsider the credibility of Tracy's testimony presented at trial in light of the fact that her husband was not capable of refuting Tracy's claims about their relationship. Therefore, we find this assignment of error to be without merit.

CONCLUSION
The jury's verdict was not contrary to the overwhelming weight of the evidence produced at trial. Defense counsel's express refusal of a manslaughter instruction was a calculated trial strategy, and counsel's employment of this strategy did not deny Hiter her Sixth Amendment right to the effective assistance of counsel. The prosecution's remarks made during closing argument merely referred to facts which had been admitted at trial, and they were not unduly prejudicial so as to deny Hiter a trial which was fundamentally fair.
CONVICTION OF MURDER AND SENTENCE OF LIFE IMPRISONMENT IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS AFFIRMED.
HAWKINS, C.J., DAN M. LEE, and PRATHER, P.JJ., PITTMAN, BANKS, McRAE, ROBERTS and SMITH, JJ., concur.