# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2024-KA-01001-SCT

*TAVION PEGUES a/k/a TAVION NYSHEIM*
*PEGUES*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 08/09/2024 |
| TRIAL JUDGE: | HON. JAMES T. KITCHENS, JR. |
| TRIAL COURT ATTORNEYS: | PAYTREEN KEYUM DAVIDSON |
| | JAY HOWARD HURDLE |
| | LEOGHAIN STRNAD FAIR |
| COURT FROM WHICH APPEALED: | OKTIBBEHA COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER |
| | BY: GEORGE T. HOLMES |
| | STACY L. FERRARO |
| | W. DANIEL HINCHCLIFF |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: INDIA MARIAH SPRINKLE |
| DISTRICT ATTORNEY: | SCOTT WINSTON COLOM |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 01/22/2026 |
| MOTION FOR REHEARING FILED: | |

**BEFORE COLEMAN, P.J., GRIFFIS AND SULLIVAN, JJ.**

**COLEMAN, PRESIDING JUSTICE, FOR THE COURT:**

¶1. An Oktibbeha County jury convicted Tavion Pegues of possession of a firearm by a felon. He appeals and argues, first, that the State committed prosecutorial misconduct by commenting on his failure to call his nephew and mother as witnesses and on the fact that he exercised his constitutional right to a trial, and, second, he argues that the State failed to present sufficient evidence of constructive possession of the firearms.

¶2.    There being no error, we affirm.

## FACTS

¶3.    On September 16, 2022, an individual filed a police report after someone stole his Glock 42 with the name "Hendricks" stamped on it.  Authorities obtained an arrest warrant for Pegues after security footage helped identify him as the robber.  On February 8, 2023, law enforcement with the Starkville Police Department arrested Pegues after recovering two firearms from his sister's home.   On March 28, 2023, an Oktibbeha County grand jury indicted Pegues for the crimes of armed robbery, possession of a firearm by a convicted felon, and possession of a stolen firearm.  Ultimately, the State proceeded only on the charge of possession of a firearm by a convicted felon.

¶4.    The circuit court held a jury trial on July 25, 2024.  In the State's opening statement, the prosecution said to the jury: "It's a simple case.  So why are we here today?  Because he's entitled to a trial.  It's his constitutional right.  He has that right to have a trial today."  Pegues and the State stipulated to the jury that Pegues was a convicted felon.

¶5.    The State then called as its first witness Pegues's sister Azaria Ross.  Ross testified that law enforcement came to her home on February 8, 2023, searching for Pegues.  Ross confirmed that Pegues was at her home when law enforcement arrived and that law enforcement searched her home after obtaining a search warrant.  She stated that law enforcement found two firearms and a pistol magazine matching the caliber of one of the firearms in her son's bedroom, where Pegues occasionally would stay the night.  Ross confirmed that the firearms did not belong to her and that she was unaware of their presence.

2

¶6.    Ross also testified that she informed law enforcement that the personal items and clothing that they found in the tote in her son's closet belonged to Pegues. She noted that her mother and her mother's boyfriend also occasionally stayed in her son's bedroom. She testified that her mother lived with her and that her mother and her boyfriend sometimes slept in her son's bedroom but sometimes slept in the living room, depending on who went to sleep first. Ross also stated that her mother did not own a firearm, but she admitted that she could not say whether her mother's boyfriend owned any firearms.

¶7.    Ross testified further that Pegues called her before the trial and instructed her not to attend the trial to testify; the recording of the conversation was then entered into evidence and played for the jury. She also stated that Pegues asked her to testify that the clothes found in the tote belonged to their mother.

¶8.    On cross-examination, Ross acknowledged that it was her home that law enforcement searched and that Pegues's name did not appear on the home's lease. She again stated that other individuals would stay in her son's bedroom, so Pegues did not stay there every night. Ross stated that she did not know whether the firearms that law enforcement found belonged to Pegues, and she again noted that she had never seen them.

¶9.    On recall by the State, Ross confirmed that Pegues did not have a home, so he would either stay with her or another female. She also testified that the backpack that law enforcement found in her son's bedroom did not belong to her, her son, or her mother; that she had never before seen the backpack or the firearm that law enforcement found inside the backpack; and that neither she nor her mother owned a firearm. Through that testimony, the

3

State admitted a photograph of the items that law enforcement found at her home resulting from the search.

¶10. The State then called Starkville Police Department's Sergeant of Cyber Crime Investigations, Chris Jackson, who performed the forensic analysis of Pegues's cellphone. Sergeant Jackson testified that he found multiple photographs and videos of Pegues possessing a firearm. One video found on Pegues's cellphone was dated January 28, 2023, and another photograph and video were dated January 29, 2023. They were admitted into evidence.

¶11. Next, the State called Detective Josh Horton with the Starkville Police Department, and he testified that he executed the search warrant of Ross's home on February 8, 2023. His testimony overlapped with what had Ross testified: Pegues occasionally stayed at Ross's home, specifically, in her son's bedroom, in the closet of which they found the tote that contained the stolen firearm. Detective Horton incorrectly identified the stolen firearm as a .380-caliber Ruger with "Hendricks" written on the firearm's backplate, which was found along with a pistol magazine and Pegues's clothes. After the State presented Detective Horton with the two firearms collected at the scene, he acknowledged that he had misspoken about the brand of the firearms. In that same bedroom, Detective Horton testified that they found a backpack on the bed that Pegues used, which contained a firearm that he also incorrectly stated was a .22-caliber Ruger.

¶12. Through Detective Horton's testimony, the State admitted into evidence photographs taken during the execution of the search warrant, including photographs of the son's

4

bedroom; the pistol magazine; the tote and its contents, which included the pistol magazine and ammunition; and Pegues's driver's license, debit card, and clothes. It also admitted into evidence the two firearms themselves—a Glock 42 and a .22 caliber Smith and Wesson Victory. The jury viewed the videos and photographs of Pegues possessing the Glock 42 that Sergeant Jackson extracted from Pegues's cellphone.

¶13. Detective Horton also testified regarding his interview with Pegues. He stated that, when he asked Pegues if he knew about the Glock 42, Pegues replied that he knew the firearm was in the closet since "Day 1, when [I] took it." However, Detective Horton stated that Pegues denied knowledge of the .22-caliber Smith and Wesson Victory. Detective Horton admitted that they did not find the firearms on Pegues's person but averred that the evidence from Ross's home supported his constructive possession of the firearms.

¶14. The State then rested, and Pegues moved for a directed verdict, which the trial court denied. Subsequently, the defense called Pegues to testify. He testified that he was simply visiting Ross at her home when law enforcement arrived and arrested him. He claimed that he had continually denied any knowledge of the firearms when law enforcement inquired and that nothing law enforcement found in the home belonged to him. Pegues testified that his nephew informed him that he had found the firearm in the park and had hidden it in his bedroom because he did not want to get in trouble with his mother. Pegues also testified that the video the State played for the jury showed him with a toy gun, not a real firearm.

¶15. On cross-examination, Pegues denied ever staying the night at Ross's home. He explained that Ross falsely believed he would stay the night at her home because she would

5

fall asleep before he left her home. He then testified that his mom had his food-stamp card and another of his identification cards so she could get food and that he had given some of those clothes to her. He stated that he gave some of the clothes to her so she could wash them for him, and the others he gave her to have since she did not own any clothes.

¶16. Pegues also repeated that the backpack belonged to his nephew and that his nephew had found the firearm in the park. The State then asked Pegues whether his nephew was going to testify that he found the firearm in the park as Pegues claimed, and he replied: "I'm pretty much sure he is." Pegues then denied telling Detective Horton during his interrogation that he knew the Glock 42 was in the closet. From Pegues's denial, the video of his interrogation with Detective Horton was entered into evidence and shown, in part, to the jury.

¶17. Detective Horton testified alongside the interrogation video. He noted that Pegues admitted stealing the Glock 42 and placing it in the closet and that Pegues claimed he had no knowledge of the .22-caliber firearm. Detective Horton pointed out that Pegues never mentioned that his nephew found the firearm. He also testified that they did not find toy guns when they searched Ross's home.

¶18. In the State's closing argument, the prosecutor stated to the jury: "In fact, he didn't even call his nephew. He could have called [his] nephew to [the] stand. He could have called the momma to [the] stand. But he didn't do it. Why? Dishonest lies."

¶19. At the trial's conclusion, the jury found Pegues guilty, and the trial court sentenced him to life in prison without the possibility of parole as a habitual offender pursuant to

Mississippi Code Section 99-19-83 (Rev. 2020). Pegues filed a motion for a judgment notwithstanding the verdict or, in the alternative, for a new trial, which the trial court denied.

**DISCUSSION**

### I.     Whether the State committed prosecutorial misconduct.

¶20.    Pegues argues that (1) the State improperly commented on his failure to call his mother and nephew as witnesses because they were equally available to both parties, and (2) the State improperly commented on the fact that he exercised his constitutional right to a trial.

¶21.    As the State points out, and as Pegues acknowledges, he failed to make a contemporaneous objection at trial, so the aforementioned issues are barred. *McCollum v. State*, 372 So. 3d 980, 985-86 (¶ 17) (Miss. 2023). However, we may review the issues for plain error. *Id.*

¶22.    The plain-error doctrine allows the Court "to correct 'obvious error which was not properly raised by the defendant and which affects a defendant's fundamental, substantive right.'" *Wilson v. State*, 194 So. 3d 855, 863 (¶ 25) (Miss. 2016) (quoting *Johnson v. State*, 155 So. 3d 733, 738 (Miss. 2014)). "For the plain-error doctrine to apply, there must have been an error that resulted in manifest miscarriage of justice or seriously affects the fairness, integrity or public reputation of judicial proceedings." *Id.* (internal quotation marks omitted) (quoting *Johnson*, 155 So. 3d at 738). The Court will typically conclude the defendant was not prejudiced when the weight of the evidence against him is overwhelming. *McCollum*, 372 So. 3d at 985-86 (¶ 17).

7

### a. Comments on Pegues's Failure to Call Witnesses

¶23. Pegues asks the Court to find error with the State's question on cross-examination when, in response to Pegues's testimony that his nephew found the firearm in the park, the State posited: "Okay. And I'm sure he's going to testify to that today, right?" Pegues responded: "I'm pretty much sure he is." In that same vein, Pegues claims that, in the State's closing argument, it improperly stated: "But he didn't do that. He didn't do that at all. In fact, he didn't even call his nephew. He could have called his nephew to stand. He could have called the momma to stand. But he didn't do it. Why? Dishonest lies."

¶24. While it is improper for one party to comment on the other party's failure to examine a witness who is equally accessible to both parties, that rule does not apply when the witness is more available to the complaining party. *Harrelson v. State*, 415 So. 3d 622, 628 (¶ 18) (Miss. 2025); *Ross v. State*, 603 So. 2d 857, 864 (Miss. 1992) (citing *Brown v. State*, 27 So. 2d 838, 841 (Miss. 1946)). Indeed, the prosecution may comment on the defense's failure to call a witness when that witness is "more available to him and presumptively in a closer relationship with him." *Ross*, 603 So. 2d at 864.

¶25. Pegues's mother and nephew were more available to him than they were to the State, and Pegues had a presumptively closer relationship with his family than does the State. As such, the State did not commit error by commenting on the fact that Pegues failed to call his mother and nephew as witnesses.

¶26. Further, Pegues could not succeed under a plain-error analysis because the State's comments did not result in a manifest miscarriage of justice that affected the fairness of his

8

trial. *Wilson*, 194 So. 3d at 863 (¶ 25) (quoting *Johnson*, 155 So. 3d at 738). Pegues was not prejudiced by the comments because the weight of evidence against him was overwhelming. *McCollum*, 372 So. 3d at 985-86 (¶ 17).

¶27. Specifically, the State presented to the jury photographs and a video of Pegues brandishing a Glock 42 with the word "Hendricks" stamped on the back of it, which had been previously reported stolen. And less than two weeks later, law enforcement recovered that same firearm, along with other items belonging to Pegues, in a tote located in a bedroom closet in Ross's home. Ross confirmed in her testimony that Pegues slept in that bedroom and that the items found in the tote belonged to Pegues. Further, the jury was shown Pegues's interrogation during which he admitted to stealing the Glock 42 and placing it in the closet. Additionally, Detective Horton testified that on a bed in the same bedroom, they found another firearm, a .22-caliber Smith and Wesson, in a backpack. Ross again confirmed in her testimony that the bed on which the backpack was found was the one Pegues used when he stayed with her and that neither the backpack nor the firearms belonged to her or her children.

¶28. Thus, we conclude that it was not error, much less plain error, for the State to comment on Pegues's failure to call his mother and nephew as witnesses.

### b. Comment on Pegues's Right to a Trial

¶29. Pegues further asserts that the State impermissibly commented on his constitutional right to a trial. He claims that the State insinuated to the jury that he was guilty in its opening

9

statement by saying: "It's a simple case. So why are we here today? Because he is entitled to a trial."

¶30. Attorneys are afforded a wide latitude in arguing their cases; however, prosecutors may not "use tactics which are inflammatory, highly prejudicial, or reasonably calculated to unduly influence the jury." *Sheppard v. State*, 777 So. 2d 659, 661 (¶ 7) (Miss. 2000) (citing *Hiter v. State*, 660 So. 2d 961, 966 (Miss. 1995)). The Court reviews a lawyer's misconduct in opening statements as "whether the natural and probable effect of the improper argument is to create unjust prejudice against the accused so as to result in a decision influenced by the prejudice so created." *Id.* (citing *Ormond v. State*, 599 So. 2d 951, 961 (Miss. 1992)).

¶31. Again, Pegues failed to object to the statement, so we must review the issue for plain error. *Wilson*, 194 So. 3d at 863 (¶ 25) (quoting *Johnson*, 155 So. 3d at 738). Under a plain-error analysis, we conclude that Pegues was not prejudiced by the State's comment because the prosecution is afforded a wide latitude in its arguments and because an extensive amount of evidence demonstrated Pegues's guilt as shown above. *Sheppard*, 777 So. 2d at 661 (¶ 7) (citing *Hiter*, 660 So. 2d at 966); *McCollum*, 372 So. 3d at 985-86 (¶ 17).

## II. Whether sufficient evidence proved constructive possession.

¶32. Pegues alleges that there was insufficient evidence to prove that he constructively possessed the firearms because he was not listed on the lease and because multiple individuals utilized the bedroom where the firearms were found.

¶33. Pegues argues that the State presented insufficient evidence because it presented evidence gathered before the date cited in the indictment, February 8, 2023, which is the date

that law enforcement conducted its search. He maintains, consequently, that he was not provided with the specific date(s) that he allegedly possessed the firearms, so he was improperly required to defend a significant lapse of time.

¶34. The State counters that Pegues failed to specify what evidence was insufficiently gathered before the date cited in the indictment and failed to cite relevant authority, so it claims that we need not consider the issue on appeal. Notwithstanding the procedural bar, the State asserts that, assuming the complained-of evidence were the photographs and video that were taken less than two weeks before February 8, 2023, the evidence was sufficient to establish actual possession, and an "exact date was not an essential element of the State's proof." The State notes that the indictment provided that Pegues possessed the firearm "on or about" February 8, 2023, which relieved it from having to prove an exact date. The State then asserts that a variance of less than two weeks is reasonably near February 8, 2023. The State also claims the evidence was sufficient to prove constructive possession.

¶35. Our Court reviews a trial court's denial of a directed verdict or judgment notwithstanding the verdict, which is a challenge to the sufficiency of the evidence, *de novo*. *Hawkins v. State*, 410 So. 3d 462, 467 (¶ 15) (Miss. 2025). In reviewing sufficiency-of-the-evidence claims,

> this Court views all evidence in the light most favorable to the State and will reverse and render judgment in favor of the defendant "only if the facts and inferences 'point in favor of the defendant on any element of the offense with sufficient force that reasonable men could not have found beyond a reasonable doubt that the defendant was guilty . . . .'"

*Id.* (alteration in original) (quoting *Haymon v. State*, 346 So. 3d 875, 881 (Miss. 2022)).

11

¶36. For a defendant to be guilty of the crime of felon in possession of a firearm, "[t]he State must prove: (1) the defendant possessed a firearm, and (2) the defendant had previously been convicted of a felony crime." *Williams v. State*, 305 So. 3d 1122, 1129 (¶ 16) (Miss. 2020) (citing Miss. Code Ann. § 97-37-5 (Rev. 2014)). The State may provide direct or circumstantial evidence that the defendant possessed a firearm, with both types of evidence carrying the same weight. *Id.* (¶ 17) (citing *Cardwell v. State*, 461 So. 2d 754, 760 (Miss. 1984)).

¶37. When a firearm is not found on the defendant's person, the State must prove that he constructively possessed the firearm. *Christian v. State*, 207 So. 3d 1207, 1218 (¶ 54) (Miss. 2016) (citing *Williams v. State*, 971 So. 2d 581, 587 (Miss. 2007)). The State may prove the defendant constructively possessed contraband by showing that the contraband was under the defendant's dominion and control. *Id.* (citing *Roberson v. State*, 595 So. 2d 1310, 1319 (Miss. 1992)). The facts must sufficiently show that the defendant was aware of the contraband's presence and character and intentionally and consciously possessed it. *Id.* (citing *Roberson*, 595 So. 2d at 1319). A defendant's proximity to contraband is an important consideration, but, by itself, proximity is insufficient to prove constructive possession. *Terry v. State*, 324 So. 3d 753, 755-56 (¶ 8) (Miss. 2021). Additionally, when contraband is found on premises that the defendant does not exclusively control or possess, the State is required to provide additional incriminating facts connecting the defendant to the contraband. *Christian*, 207 So. 3d at 1218-19 (¶ 54) (quoting *Ginn v. State*, 860 So. 2d 675, 685 (Miss. 2003)).

¶38. To that point, Pegues cites *Smoots v. State*, in which three men, including Smoots, were present at a pool hall when law enforcement arrived, heard a toilet flushing, and found crack cocaine in the sewage pipes. *Smoots v. State*, 310 So. 3d 1184, 1189 (¶ 18) (Miss. Ct. App. 2020). Smoots was subsequently convicted of possession of cocaine. *Id.* However, the Court of Appeals reversed his conviction, holding that "[t]he evidence was not sufficient to prove beyond a reasonable doubt that *Smoots*—and not one of the other two men—was guilty of possessing and flushing the drugs." *Id.* Accordingly, the Court of Appeals concluded that the State was "required to provide some independent proof" that Smoots possessed and flushed the drugs found in the sewage. *Id.*

¶39. Here, Pegues stipulated that he had been convicted of a felony crime, so the State was only required to prove that he possessed a firearm. *Williams*, 305 So. 3d at 1129 (¶ 16) (citing § 97-37-5). Although Pegues was present when law enforcement arrived to conduct the search, law enforcement did not find either firearm on Pegues's person, so the State was required to prove that he constructively possessed a firearm by showing that it was under his dominion and control. *Christian*, 207 So. 3d at 1218 (¶ 54) (citing *Williams*, 971 So. 2d at 587; *Roberson*, 595 So. 2d at 1319). Further, since the firearms were found at Ross's home, which Pegues does not exclusively control or possess, the State was required to provide additional evidence connecting Pegues to the firearms. *Christian*, 207 So. 3d at 1218-19 (¶ 54) (quoting *Ginn*, 860 So. 2d at 685). We believe that it did.

¶40. In viewing the evidence in the light most favorable to the State, the State provided sufficient evidence to prove that Pegues constructively possessed the firearms on February

13

8, 2023.  Specifically, the State presented to the jury Pegues's interrogation video in which he admitted taking the Glock 42 and placing it in the closet where it was found during the search.  Further, Ross testified that Pegues stayed in the bedroom where the firearms were found, that the items found in the tote, along with the Glock 42 belonged to Pegues, that the backpack containing the .22-caliber Smith and Wesson was found on the bed that Pegues used when he stayed there, and that the backpack did not belong to her or her children.  Additionally, Detective Horton reiterated Ross's testimony, providing that they found Pegues's driver's license and food-stamp card in the same tote as the Glock 42.  Lastly, the State admitted into evidence photographs and a video of Pegues brandishing one of the firearms less than two weeks before law enforcement found it in the search.

¶41.    The Court also agrees with the State that Pegues was not required to defend too broad of a period of time.  The indictment properly provided that Pegues possessed a firearm "on or about the 8th day of February, 2023," relieving the State of its duty to provide an exact date.  *Robinson v. State*, 405 So. 3d 1230, 1235 (¶ 16) (Miss. 2025) (citing *Ross v. State*, 288 So. 3d 317, 323 (¶ 21) (Miss. 2020)).  Moreover, the evidence furthest away in time from the indictment date of February 8, 2023, were the photographs and video of Pegues—taken by Pegues himself less than two weeks before the search was conducted—brandishing a firearm.  Two weeks is well within the two-month time frame that the Court has held to be proper.  *Id.* ("[T]he Court has held that 'a period of two months is within reasonable limits of, or reasonably near,' the dates alleged in an indictment, especially when the indictment uses 'on or about' language." (quoting *McBride v. State*, 61 So. 3d 138, 150 (¶ 51-52) (Miss. 2011)).

14

¶42.    Regardless, even without the photographs and video, the evidence was sufficient such that a jury could find that Pegues constructively possessed the firearms on February 8, 2023.

## CONCLUSION

¶43.    Accordingly, the Court affirms Pegues's conviction and sentence for possession of a firearm by a convicted felon.

¶44.    **AFFIRMED.**

**RANDOLPH, C.J., KING, P.J., ISHEE, GRIFFIS, SULLIVAN AND BRANNING, JJ., CONCUR.**